

U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

_____

*401 Market Street - 4th Floor*     856/757-5011
*Camden, NJ 08101*

November 3, 2011

***Via Hand Delivery***
Honorable Ann Marie Donio
United States Magistrate Judge
Mitchell H. Cohen Federal Courthouse
One John F. Gerry Plaza
Fourth and Cooper Streets
Camden, New Jersey 08101

      Re:   United States v. Scarfo
              Criminal No. 11-740-01 (RBK)

Dear Judge Donio:

      In advance of tomorrow's detention hearing in the above-captioned matter, enclosed please find the government's Memorandum of Law in Support of the Government's Motion Pursuant to Title 18, United States Code, Section 3142.  If Your Honor has any questions or needs any additional information, I can be reached at (856) 757-5011.

            Respectfully yours,

            PAUL J. FISHMAN
            United States Attorney

            By: Steven D'Aguanno
            Assistant U.S. Attorney

Enclosures

cc: Michael Riley, Esq.
      w/ enclosure

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable Ann Marie Donio |
| | : | |
| v. | : | |
| | : | Crim. No. 11-740-01 (RBK) |
| NICODEMO S. SCARFO | : | |
| a/k/a "Nicky," | : | |
| a/k/a "Nick," | : | |
| a/k/a "Cousin," | : | Title 18 U.S.C. §§ 371, |
| a/k/a "Junior," | : | 922(g)(1), 1343, 1349, 1512(k) |
| a/k/a "Nick Promo," | : | 1956(h), 1962(d), and 2 |
| a/k/a "Mr. Apple," | : | |
| a/k/a "Mr. Macintosh." | : | |

<u>MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION PURSUANT
TO TITLE 18, UNITED STATES CODE, SECTION 3142</u>

PAUL J. FISHMAN
United States Attorney
District of New Jersey
970 Broad Street
Newark, New Jersey 07102

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion, pursuant to Title 18, United States Code, Section 3142, for an order detaining lead defendant Nicodemo S. Scarfo ("Scarfo") pretrial.

Scarfo is a made member of the Lucchese organized crime family of La Cosa Nostra ("the Lucchese crime family").  Pursuant to Title 18, United States Code, Section 3142(e), there is no condition or combination of conditions which "will reasonably assure the appearance of such person as required and the safety of any other person and the community."  In short, Scarfo engaged in an extensive pattern of criminal activity while on federal supervised release and under the most restrictive non-custodial condition, home confinement with electronic monitoring. Accordingly, the entry of an order detaining Scarfo pretrial is clearly warranted.

As alleged in the Indictment, Scarfo was a member of a racketeering enterprise ("the Enterprise") that operated in the District of New Jersey and elsewhere.  The purposes of the Enterprise were:  (A) to generate money for its members and associates through the commission of various illegal acts, including wire fraud, mail fraud, bank fraud, securities fraud, money laundering, and extortion; and (B) to conceal the existence of the Enterprise, including but not limited to the LCN's

2

influence over the Enterprise, and avoid detection of its illegal activities by regulatory authorities and law enforcement through obstruction of justice, false statements, and other means.

In conducting the affairs of the Enterprise, Scarfo, as well as other members and associates, made use of, sought to benefit, and benefitted from, its connection to the LCN.  In addition, members and associates of the Scarfo-Pelullo Enterprise sought to ensure that the proceeds obtained through the various illegal activities of the Enterprise were used to enrich members and associates of the LCN, primarily Scarfo, and proceeds were in fact distributed to members and associates of the LCN including Scarfo.

Scarfo and Pelullo purported to be working as "consultants" to FPFG, but in fact controlled the company.  This fact, above all else, needed to be concealed in order for the scheme to continue.  As a result, members and associates of the Enterprise, including Scarfo, concealed their crimes through a multitude of lies and deception.  The concealment of the Enterprise's criminal activity involved, among other things, false statements and material omissions in required filings with the United States Securities and Exchange Commission ("SEC"), laundering the proceeds of the criminal activity through the ownership and control of various companies, and concealing defendant Scarfo's involvement in the Enterprise's activities from law enforcement

and regulatory authorities, the United States District Court for the District of New Jersey (the "District Court"), and the United States Probation Office for the District of New Jersey (the "Probation Office").

The Enterprise and its members and associates also assisted Scarfo in obtaining and storing a cache of weapons for use in protecting the Enterprise because of the LCN influence over the Ent

Scarfo, now 46 years old, faces severe penalties if convicted of the instant charges; the prospect that he will spend his remaining days incarcerated provides compelling incentive to flee. As a result of that incentive to flee and the ongoing threat Scarfo poses to the community if released, the Court should enter an order detaining Scarfo pending trial.

## OVERVIEW OF CHARGES

### A.   RICO (Count 1)

Scarfo is charged with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 <u>et seq.</u>, for his role in conspiring to engage in the affairs of the Enterprise, which consisted of a pattern of racketeering activity that involved multiple acts of wire fraud, mail fraud, bank fraud, securities fraud, money laundering, extortion, and obstruction of justice. The maximum penalty on Count 1 is a 20-year period of incarceration.

4

**B.    Securities Fraud Conspiracy (Count 2)**

As alleged in the Indictment, Scarfo and other members of the conspiracy executed a scheme to take over and defraud FirstPlus Financial Group ("FPFG"), a publicly traded company located in Texas.  A necessary component of the scheme involved concealing Scarfo's involvement in the Enterprise and its control of FPFG from the SEC.  The Enterprise, led by Scarfo, engaged in a systematic course of submitting false information to the SEC and omitting material facts from filings made with the SEC.  The violation of 18 U.S.C. § 371 involving this criminal activity carries a maximum penalty of 5 years incarceration.

**C.    Wire Fraud Conspiracy (Count 3)**

In order for the scheme to defraud FPFG to succeed, Scarfo and the other members of the conspiracy engaged in multiple acts of transferring large sums of money from FPFG to accounts controlled by Scarfo and others.  The violation of 18 U.S.C. § 1349 carries a maximum penalty of 20 years incarceration.

**D.    Substantive Wire Fraud Charges (Counts 4 through 19)**

Scarfo and other members of the conspiracy engaged in a complex series of transactions pursuant to purported consulting and other agreements, as well as the acquisition of Scarfo's shell companies by FPFG, which resulted in recurring transfers of money from FPFG to accounts controlled by Scarfo and others.

5

Each substantive wire fraud charge in violation of 18 U.S.C. § 1343 carries a maximum penalty of 20 years incarceration.

**E.   Money Laundering Conspiracy (Count 20)**

Once Scarfo and the other members of the conspiracy capitalized on their scheme to defraud FPFG, it became necessary to launder the proceeds of the fraud to further conceal Scarfo's ill-gotten gains from law enforcement and regulatory authorities, the Probation Office and the District Court.  The violation of 18 U.S.C. § 1956 carries a maximum penalty of 20 years incarceration.

**F.   Bank Fraud Conspiracy (Count 21)**

As alleged in the Indictment, between approximately December 2007 and March 2008, Scarfo and other members of the conspiracy devised a scheme to defraud a financial institution to obtain a fraudulent mortgage for Scarfo and his wife, co-defendant Lisa Murray-Scarfo ("Murray-Scarfo").  The violation of 18 U.S.C. § 1349 carries a maximum penalty of 30 years incarceration.

**G.   False Statement in Loan Application Conspiracy (Count 22)**

In furtherance of the scheme to obtain the fraudulent mortgage described above, Scarfo and other members of the conspiracy submitted false information in support of a loan application.  The violation of 18 U.S.C. § 371 involving this criminal activity carries a maximum penalty of 5 years incarceration.

## H.  Conspiracy to Obstruct Justice (Count 23)

As alleged in the Indictment, Scarfo and other members of the conspiracy engaged in a scheme to mislead and corruptly influence the District Court and Probation Department regarding Scarfo's federal supervised release between approximately June 2007 and April 2008.  The violation of 18 U.S.C. § 1512 carries a maximum penalty of 20 years incarceration.

## I.  Firearms Conspiracy (Count 24)

Scarfo and others conspired to possess and transfer multiple firearms and ammunition despite the fact that Scarfo and his co-defendant, Salvatore Pelullo ("Pelullo"), were prohibited from possessing firearms or ammunition because they were convicted felons.  The violation of 18 U.S.C. § 371 involving this criminal activity carries a maximum penalty of 5 years incarceration.

## J.  Felon in Possession (Count 25)

Scarfo, as a convicted felon, was prohibited from possessing firearms or ammunition.  On May 8, 2008, Scarfo possessed two handguns, a .357 caliber revolver and a 9mm pistol, as well as multiple rounds of ammunition for the firearms.  The .357 revolver was illegally provided to Scarfo by co-defendant John Maxwell, the purported Chief Executive Officer of FPFG.  The violation of 18 U.S.C. § 922 carries a maximum penalty of 10 years' incarceration.

7

**BACKGROUND**

**A.    Takeover and Control of FPFG**

In approximately June 2007 and thereafter, the Enterprise, led by Scarfo, achieved its goal of relying on explicit and implicit threats of economic and physical harm and intimidation to assume and maintain control of FPFG.  Through this conduct, the Enterprise also sought to ensure that its demands were followed, and that the Enterprise's affairs were concealed.

For example, in approximately late May or early June 2007, Pelullo and co-defendant William Maxwell, FPFG's "special counsel," executed the one of the early steps in the takeover by falsely accusing Individual #1 of engaging in financial improprieties with FPFG's assets while he/she served as a member of FPFG's board of directors.  The takeover also involved threats by Pelullo and William Maxwell to file a baseless lawsuit against Individual #1 and FPFG related to the false allegations of financial impropriety.  As a direct result of the threats, Individual #1 used his/her influence with FPFG to turn over control of FPFG to the Enterprise.

The takeover of FPFG involved filling its board with individuals who were associated with the Enterprise and ultimately answered to Scarfo, Pelullo, and William Maxwell.  To make sure that the figurehead board members knew exactly who was in control and what could happen if Scarfo's and Pelullo's

8

criminal activity were ever disclosed, Pelullo told Individual #3, who was one of the figurehead board members put in place after the takeover, "if you ever rat, your wives will be f**ked . . . and your kids will be sold off as prostitutes." Pelullo further punctuated the message by later telling Individual #3, "you have mine and Nicky's family in your hands."

The "figurehead" board members and executive officers conducted transactions designed to benefit the Enterprise while concealing the roles of Scarfo and Pelullo in controlling FPFG. The figurehead board served to "rubber stamp" the directives of Scarfo and Pelullo and made the board's decisions appear to be independent and legitimate to conceal the involvement and control of Scarfo and Pelullo.

The ultimate, corrupt control exerted over FPFG by Scarfo and Pelullo became clear during a telephone call recorded by the Federal Bureau of Investigation ("FBI") on October 15, 2007. Pelullo called co-defendant David Adler ("Adler"), FPFG's securities attorney, to discuss the shareholders who had yet to vote their shares to ratify the figurehead board, among other things. At Pelullo's direction, Adler added John Maxwell to the call. Pelullo told Adler, "David, part of the conversation you've gotta close your ear," and then said, ". . . now listen to me. This is coming from our friend from back Jersey [meaning Scarfo] . . . and it's gotta be executed without a flaw, without

a hesitation, without a second to waste."  Pelullo described for John Maxwell and Adler the list of un-voted shareholders, and ordered John Maxwell, "I don't care what you gotta do, I don't care how you do it, but before the close of the day, I want these guys bought, sold, and voted . . . Get back to the office NOW . . . Nobody wants to come back north and explain that we lost this because of this bullshit," to which John Maxwell responded, "Right, I got it."  Pelullo continued, ". . . You, yourself, individually, go back, find these people's names and numbers . . . get on the phone.  I don't care if they're in a funeral parlor, I don't care if they're in a doctor's office, I don't care if they're in a f**kin' hospital on a respirator, we'll send somebody there, I want their vote, I want their signature, and I want it done by the close of the day today," to which John Maxwell responded, "Done."  Adler then suggested that their proxy solicitor research the names and addresses of the un-voted shareholders, to which Pelullo responded, "well the official position of the company is 'do it!'"

Two days later, after the Enterprise succeeded in deceiving FPFG's shareholders to approve the figurehead board, Pelullo called defendant Scarfo to tell him "we crushed them" [meaning the opposition shareholders who had, among other things, opposed seating the figurehead board].  After describing some of the details of the meeting, Scarfo said, "congratulations brother,"

10

to which Pelullo responded, "it was all upon your direction . . ." and "the only people that can f**k it up now . . . is us." Later in the conversation, Pelullo said, "talk to your pop and let him know," to which Scarfo said, "I'll let you do the honors, like last time."

Scarfo and Pelullo were so concerned about their criminal activity being uncovered that they expressed outright joy at the sudden death of one of their cohorts who had assisted them in the takeover of FPFG.  On December 5, 2007, in a recorded telephone call with Scarfo, Pelullo told him about the sudden death of a former FPFG executive (hereafter Individual #4) who had provided information to Pelullo and William Maxwell that they used at the time of the takeover to extort control of FPFG from Individual #1.  At the time of his death, Individual #4 was employed by FPFG as a member of its "compliance team."  During the conversation, Scarfo and Pelullo expressed relief regarding Individual #4's death.  After laughing about how he was "crushed" that "the rat is dead," Pelullo acknowledged that Individual #4 was "the only connection, the only tie to anything."  As the news sunk in to Scarfo, he stated, "Oh boy.  Yeah, Sal, you wanna know something though? . . . That's one that I know you can't take credit for . . . [laughter] . . . and that's the natural best thing.  You know what I mean? . . . That is so like Enron-ish.  You know what I mean?  Kenneth Lay, he bailed out and took a heart attack."

11

Finally, On April 6, 2008, during a recorded telephone conversation following the end of defendant Scarfo's supervised release, Scarfo discussed how he wanted defendant Pelullo to handle FPFG's affairs going forward in relation to Scarfo. Specifically, Scarfo said that he needed Pelullo to repeat and reinforce the idea that, "we gotta follow this guy" (meaning Scarfo).  Pelullo responded, "just because they didn't see you and I try to enforce that, it was, you know, you behind the scenes, and I was just a conduit, . . . through you, to make sure that things got done the way we planned to get them done."

**B.    Consulting and Legal Services Agreements**

Having assumed control of FPFG through its new figurehead board of directors and executive officers, Scarfo and Pelullo caused the creation and execution of legal services and consulting agreements that were used to misappropriate and funnel money out of FPFG and into accounts controlled by the Enterprise on a monthly basis.  These legal services and consulting agreements included the following:

The Enterprise caused defendant William Maxwell to be hired as FPFG's "special counsel," through the execution of a purported "legal services" agreement.  Based on the nearly unlimited scope of the agreement, the figurehead board of FPFG effectively abdicated its control of FPFG to William Maxwell.  This "legal services" agreement awarded defendant William Maxwell a monthly

12

payment of $100,000 plus expenses and, among other things, granted him the authority to enter into "consulting" agreements at his discretion, for which the company would ultimately be charged.  Between June 2007 and March 2008, approximately $3.5 million was sent via wire transfers from accounts associated with FPFG to accounts controlled by defendant William Maxwell, ostensibly for his own services and those of the purported consultants.

One such "consulting" agreement, executed between defendant William Maxwell and defendant Pelullo's corporate alter ego, Seven Hills, fraudulently portrayed Pelullo as a mere "consultant" to FPFG.  In fact, Pelullo was actually FPFG's de facto Chief Executive Officer and controlled its operations through other members and associates of the Enterprise, including the figurehead board and executive officers.  Between May 2007 and March 2008, approximately $1.5 million of the $3.5 million received by William Maxwell from FPFG was sent via wire transfers from accounts associated with defendant William Maxwell to accounts associated with Pelullo's corporate alter ego, Seven Hills.

In turn, defendant Pelullo, through Seven Hills, executed a "consulting" agreement with defendant Scarfo, through Scarfo's corporate alter ego, Learned Associates.  Although Scarfo performed no legitimate work pursuant to this agreement, Scarfo

13

received $33,000 per month, including during the three-month period that Scarfo was confined to his home by order of the District Court.  Between June 2007 and April 2008, approximately $425,000 was sent via wire transfers from accounts associated with Seven Hills to accounts associated with Scarfo's corporate alter ego, Learned Associates, pursuant to the fraudulent consulting agreement.  Despite his attempts to make the consulting agreement appear to be legitimate, Scarfo repeatedly withheld the agreement and the monthly transfers in excess of $30,000 he received from his probation officer, as Scarfo was required to do under the terms of his supervised release.  The following table details the monthly transfers Scarfo received through his corporate alter ego, Learned Associates.

| Date | Amount | Source Acct. | Beneficiary Acct. |
|------|--------|--------------|-------------------|
| 7/5/07 | $33,000 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 8/2/07 | $33,000 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 8/31/07 | $33,500 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 10/9/07 | $36,202.29 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 11/5/07 | $40,863.91 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 12/6/07 | $33,000 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 1/4/08 | $5,222.87 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |

14

| 2/4/08 | $33,000 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 2/4/08 | $6,127.76 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 3/3/08 | $33,000 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 3/3/08 | $4,593.26 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 4/2/08 | $33,000 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |
| 4/2/08 | $3,982.71 | Seven Hills xxxxx7216 | Learned Associates xxxxxx3017 |

## C.   Fraudulent Acquisitions

As a publicly traded company, FPFG was obligated to make regular filings with the SEC, and was obligated in those filings to disclose all material facts about the company to the SEC and its shareholders.  Among other things, FPFG was required to fully and accurately disclose in its SEC filings the identities of the individuals who exercised control over FPFG and its subsidiaries, as well as the identities of individuals involved in related party transactions with FPFG.  Members and associates of the Enterprise willfully failed to disclose material facts regarding defendant Scarfo's and Pelullo's control over FPFG and their ownership of the entities purchased by FPFG as a result of their control.

15

In approximately June 2007, Scarfo, Pelullo, and other members of the Enterprise caused FPFG to acquire corporate entities in which Scarfo and Pelullo had an ownership interest. These entities, including Rutgers Investment Group LLC and Globalnet Enterprises LLC, were acquired as part of the scheme to defraud FPFG shareholders and deceive the SEC.  They were also acquired to enable Scarfo and Pelullo to transfer millions of dollars and several hundred thousand shares of FPFG common stock to themselves.  These corporate entities owned by Scarfo and Pelullo, through their ownership of Learned Associates and Seven Hills, respectively, had little, if any, value and were grossly overvalued at the time of their acquisition by FPFG.  As described below, Scarfo, while on supervised release, lied to his probation officer about his involvement in these transactions and deliberately withheld this information from the District Court despite Scarfo's attempts to convince the District Court that he (Scarfo) had the potential for "promising growth in the business community."

D.   **Obstruction of Justice**

Aside from the need to hide defendant Scarfo's involvement from FPFG's shareholders, Scarfo's involvement also needed to be concealed from the District Court and the Probation Office.

Members and associates of the Enterprise and their co-
conspirators took various steps to conceal Scarfo's involvement
in FPFG from those federal authorities.

Scarfo and his co-conspirators realized that Scarfo's
probation officer or the District Court might uncover his
involvement in the scheme to defraud FPFG.  In an audacious
preemptive move, in August 2007, Scarfo filed a petition with the
District Court to terminate the remaining portion of his
supervised release earlier than its April 2008 scheduled
expiration.  According to the petition, Scarfo's supervised
release made it "difficult for him to . . . further his, already
promising, growth in the business community."  Despite the fact
that Scarfo was trying to convince the District Court that he was
a legitimate businessman, the petition failed to disclose his
corporate alter ego, Learned Associates, the hundreds of
thousands of dollars Scarfo had obtained from the Rutgers and
Globalnet acquisitions only weeks earlier, and the $33,000 a
month "consulting" agreement he had just signed with Pelullo's
company, Seven Hills.

In addition, because of their heightened awareness of the
risk posed by Scarfo's supervised release conditions to the
continued operation of the Enteprise, Scarfo, Pelullo, William
Maxwell, and co-defendant Donald Manno ("Manno") actively sought

17

to neutralize that risk.  For example, on September 4, 2007, in a recorded telephone conversation, Scarfo and Pelullo discussed devising a story to tell Scarfo's probation officer so that Scarfo and Pelullo could continue to "associate" with each other. While discussing the story, Pelullo suggested that Scarfo, "run it by Donny" (referring to Manno).  Needless to say, Scarfo never informed his probation officer of Scarfo's ongoing contact and association with Pelullo, which was a violation of the terms of Scarfo's federal supervised release and for which Scarfo could have been incarcerated.  Between at least June 2007 and April 2008, Scarfo lied on a monthly basis when he submitted his Monthly Supervision Reports to his probation officer.  In each reaport, Scarfo lied when he indicated that he had not had contact with a convicted felon.

Moreover, in September 2007, defendants Scarfo, Pelullo, William Maxwell, and Manno embarked on a plan to deceive Scarfo's probation officer and the District Court by manufacturing a job offer from William Maxwell to Scarfo.  Specifically, Scarfo drafted a letter on William Maxwell's letterhead, which William Maxwell and Manno reviewed.  In an email response to William Maxwell and Scarfo, Manno said, "[t]he letter looks fine with the changes that Nick made.  In effect, by removing [the probation officer] from the first letter, it makes it a two step process.

18

This will give [Scarfo] an opportunity to bring it to her personally and give her more of a sense of power over the final job offer." The letter, including the final version which was ultimately submitted to Scarfo's probation officer, failed to disclose Scarfo's involvement with FPFG, the transactions involving Rutgers and Globalnet, and the $33,000 a month he was already receiving pursuant to his "consulting" agreement through Learned Associates. Manno also consulted Pelullo about the deceptive letter, and in a recorded telephone call, left a message for Pelullo on September 20, 2007 "want[ing] to touch bases (sic) really with Bill ahh, about the job and some new developments up here . . ."

In late October 2007, co-defendant Gary McCarthy ("McCarthy") became concerned about maintaining possession of records related to the creation of Learned Associates. At defendant Pelullo's direction, McCarthy forwarded the records to defendant Manno. Later that same day, Pelullo reported to defendant Scarfo that the records had been sent to Manno, stating, "I had Gary send everything for Learned Associates, me and Gary discussed it, over to Donny Manno under attorney privilege confidential information." Pelullo also stated, "your records are now sealed under attorney client privileged" and ". . . Gary's pretty slick. You know, he thought of that." With

19

approval of what Pelullo had done, Scarfo said, "[l]ayers upon layers like an onion."

Needless to say, it was integral to the scheme that defendants Scarfo and Pelullo continue to associate with each other in clear violation of Scarfo's supervised release conditions. With Scarfo still under the supervision of the Probation Office, defendant Manno attended an FPFG Christmas party which was held at a restaurant in New Jersey on December 20, 2007. In advance of the party, Manno sent out invitations to the FPFG Christmas party to associates of Scarfo on behalf of Scarfo. Pelullo and Scarfo hosted the party on behalf of FPFG despite their lack of any official positions with the company. During the party, Manno socialized with Scarfo and Pelullo, and was provided with a gift. Scarfo's ongoing contact and association with Pelullo, a convicted felon, was never brought to the attention of Scarfo's probation officer and the judge who monitored Scarfo's supervised release.

On December 26, 2007, as a result of an unrelated violation of his supervised release regarding contact with convicted felons, Scarfo was placed on home confinement with electronic monitoring for a period of three months. Despite being subjected to the most restrictive non-custodial condition of release, Scarfo continued to engage in criminal activity from his

20

residence.  For example, in approximately January 2008, members of the Enterprise assisted Scarfo in purchasing a $715,000 house in Egg Harbor Township, New Jersey (hereafter the "Egg Harbor House").  The $215,000 used for the down payment on the Egg Harbor House came directly from the scheme to defraud FPFG.  For that reason, as well as the fact that Scarfo did not inform his probation officer of the purchase, Scarfo went to great lengths to conceal his role as the true owner and financier of the Egg Harbor House purchase.

In early February 2008, at the direction of Pelullo, co-defendant Howard Drossner ("Drossner") used his position as a certified public accountant to assist Scarfo in manufacturing fraudulent tax returns for use by Scarfo's soon-to-be wife, Murray-Scarfo, in securing a $500,000 mortgage to purchase the Egg Harbor House.

Manno assisted Scarfo in concealing the source of the income used for the $215,000 down payment that was used to complete the purchase.  Scarfo married Murray-Scarfo on February 14, 2008.  That evening, Scarfo sent the following text message to Manno: ". . . it's official.  Thank you for helping get to this point.  I am a happy man.  Listen JP (meaning co-defendant Parisi) will be contacting you in th[e] morning to transfer funds.  Please [get] with him.  I want to see the transfer take place tomorrow.

21

Goodnight and I'm on my honeymoon."  On or about February 15, 2008, $140,000 was transferred from a bank account related to the LMDS trust to an escrow account controlled by Manno.  Manno ultimately issued a check from the escrow account in the amount of $215,000, which was used as the down payment for the Egg Harbor House.

Prior to the settlement for the Egg Harbor House, Scarfo and Pelullo attempted to secure a lower interest rate on the mortgage that Murray-Scarfo had obtained utilizing the fraudulent tax returns.  Despite the fact that she was now married to Scarfo, Murray-Scarfo indicated on the mortgage application that she was not married.  Murray-Scarfo also indicated on the mortgage application that none of the money used for the down payment had been borrowed, when in fact, Scarfo previously had Murray-Scarfo sign a promissory note that required her to repay the money to  a trust controlled by Scarfo, a copy of which Scarfo gave to defendant Manno.

On March 6, 2008, in a three-way recorded telephone conversation, defendants Scarfo, Pelullo, and Manno discussed fabricating a "gift letter" in support of the mortgage application.  During the conversation, Pelullo told Manno that the purpose of the letter was "to show that the two hundred and fifteen thousand" was a gift from the trust and did not have to

22

be repaid.  Later in the conversation, Scarfo said, "[w]e don't want to hand over the trust," to which Manno replied, "[n]o, we're not gonna give them the trust."  Despite Manno's knowledge that Murray-Scarfo had signed a promissory note that required her to repay the money to Scarfo, Manno drafted the gift letter as instructed by Scarfo and Pelullo.  The gift letter and fraudulent tax returns were submitted in support of the mortgage application.

In addition to the extensive fraudulent activity involving the purchase of the Egg Harbor House, Scarfo continued to engage in fraudulent activity involving FPFG while on home confinement. For example, on March 31, 2008, in a recorded telephone conversation, Pelullo told Scarfo that the "10-K" would "pop up on [Scarfo's] phone," [meaning that Scarfo would receive a copy of FPFG's Form 10-KSB when it was filed with the SEC].[1]

On or about March 31, 2008, members of the conspiracy caused FPFG to file its annual report on Form 10-KSB.  Not surprisingly, the form failed to fully disclose (i) the true nature of conspirators' ongoing control of FPFG (ii) the relationships among the conspirators and the various transactions with FPFG

---

[1]Form 10-KSB is an annual report that provides a comprehensive overview a public company's business and financial condition.

including defendant William Maxwell's legal services agreement and defendants Scarfo's and Pelullo's consulting agreements, and (iii) the true nature of the acquisitions of Rutgers, Globalnet, and Premier Group by FPFG in that Scarfo and Pelullo had ownership interests in those companies and sold those companies to FPFG at grossly overvalued prices.

In short, even during his restrictive home confinement, Scarfo continued to participate in the affairs of the Enterprise, and committed multiple acts of wire fraud, securities fraud, money laundering, obstruction of justice, and illegal possession of firearms.  He likewise continued to associate with Pelullo, a convicted felon, and failed to inform his probation officer of the tens of thousands of dollars he received in the period he was on home confinement.  All of this occurred from the friendly confines of Scarfo's Brigantine, New Jersey condominium which was financed with proceeds of the scheme to defraud FPFG.  These facts alone establish beyond any doubt that there is no condition or combination of conditions that "will reasonably assure . . . the safety of any other person and the community."  As such, Scarfo's pretrial detention is unquestionably warranted.

### LEGAL STANDARD

Pursuant to the Bail Reform Act ("the Act"), a defendant's pretrial detention is warranted "upon proof of a likelihood of flight, a threatened obstruction of justice or a danger of recidivism in one or more of the crimes" specified in the statute.  United States v. Himler, 797 F.2d 156, 160 (3d Cir. 1986); 18 U.S.C. § 3142(e).  The Third Circuit has held that the Act was designed to address "the growing problem of crimes committed by persons on release and the recognition that 'there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons.'" United States v. Accetturo, 783 F.2d 382, 383-84 (3d Cir. 1986).

The Act enumerates four factors for consideration:  (1) the nature and circumstances of the crime charged, including whether the offense is a "crime of violence;" (2) the nature and seriousness of the danger posed by the defendant's release; (3) the history and characteristics of the defendant; and (4) the weight of the evidence against the defendant.  See id. § 3142(g). Given the generalized nature of these factors, however, it is necessary to consult case law for the particularized, context-specific analysis applicable here.

**A.   The Crimes Charged Involve a Crime of Violence**

25

"The Act operates only on individuals who have been arrested for a specific category of extremely serious offenses.  Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest." United States v. Salerno, 481 U.S. 739, 750 (1987).  As the U.S. Supreme Court held in Salerno, "crimes of violence" fall within that narrow category of extremely serious offenses for which detention is warranted.

Title 18, United States Code, Section 3156(a)(4) defines the term "crime of violence" as "(A) an offense that has [as] an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another; (B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

It is well established that extortion is a crime of violence.  Indeed, the Indictment details how members and associates of the Enterprise used extortionate means to assume and maintain control of FPFG.  Moreover, as the facts described above clearly establish, Scarfo was the individual to whom the members and associates of the Enterprise answered.  See United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) ("Certainly, it cannot be gainsaid that extortion is a 'crime of violence' as

26

that term is defined by the [Bail Reform Act]."); <u>United States</u>
<u>v. Santora</u>, No. 07-1103, 2007 WL 1533839, at *2 (2d Cir. May 25,
2007) (finding that defendant "had committed a crime of violence,
specifically conspiracy to commit extortion"); <u>United States v.</u>
<u>Defede</u>, 7 F. Supp. 2d 390, 396 (S.D.N.Y. 1998) ("The offense,
extortion, is a crime of violence both because it is so definedby
statute and because its completion often involves the threat of
physical harm.").

**B.   Considerations Specific to Organized Crime Defendants**

An additional factor that militates against release in cases
involving crimes of violence is whether the defendant is
associated with a criminal organization, the activities of which
routinely include violence and threats of violence.
Specifically, with respect to an individual's association with
organized crime, in <u>United States v. Leonetti</u>, Cr. No. 88-00003,
1988 WL 61738 (E.D. Pa. June 9, 1988), Judge Antwerpen held:

> The individual criminal acts allegedly committed by
> each defendant will be examined, but these individual
> acts must always be viewed in the context of each
> defendant's alleged membership in *La Cosa Nostra* and
> what that membership and organization represents.
>
> A willingness to kill people who testify against them
> and to enforce *Omerta*, the code of silence, through
> murder, are rules that each defendant adopts and agrees
> to adhere to through his membership in *La Cosa Nostra*.
> By these rules, each of the six defendants seeking bail
> presents a very real danger to potential witnesses in
> this case.

27

Id. at *3 (emphasis in original); accord United States v.
Martorano, Cr. No. 92-26-J, 1992 WL 73558, at *7 (D. Mass. Mar.
23, 1992) (holding that "it is appropriate to consider the nature
of the La Cosa Nostra organizations in making the detention
calculation.  In particular, courts have noted the oath taken by
members of these organizations . . . of vowing to kill any
individual posing a threat to the organization.  The testimony
before the Court indicates that membership in these organizations
is highly probative of both danger and flight.  Past cases also
demonstrate a danger of obstruction of justice.").

     As noted in United States v. Eufrasio, 935 F.2d 553, 559 (3d
Cir. 1991):

>     The function of soldiers and associates, and of the mob
>     generally, was to make money by illegal means.  More
>     specifically, the enterprise's diverse purposes were
>     "to control, manage, finance, supervise, participate in
>     and set policy concerning the making of money through
>     illegal means."

As stated in United States v. Pungitore, 910 F.2d 1084, 1098 (3d
Cir. 1990):

>     A crime family is a highly structured criminal enter-
>     prise with a well defined chain-of-command.  At the
>     apex of the family's hierarchy is the "Boss," who
>     carries sole authority to approve murders and induct
>     new members into the family...  A "Consigliere" and
>     "Underboss" comprise the next tier in the family's
>     organizational hierarchy...  The Consigliere functions
>     as an advisor to the Boss and assists in the settlement
>     of disputes among members, while the Underboss oversees
>     the family's illegal endeavors when the Boss is
>     unavailable and conveys orders to members.  Under the
>     Consigliere and Underboss are the "capos" or
>     "captains," who control "crews" or "regimes" of

> "soldiers," otherwise known as "made men."  The
> soldiers, in turn, sponsor various "associates," who
> are best described as criminal colleagues of the family
> who, for various reasons, have not been formally
> initiated into its ranks.... A primary incentive for
> joining the family is that the soldier then commands
> considerable respect from non-Mafia criminals, as his
> illegal endeavors are backed by "the strength of the
> Mafia," that is, its well-founded reputation for
> achieving its objectives through violent means...
> Indeed, its members recognize it as "a second
> government."...  The soldier also becomes privy to the
> family's "political" and "union" connections...
> becoming a ranking member of the family means the
> "difference of being in the major leagues and minor
> leagues as far as gangsters are concerned."...

As noted further in Eufrasio, 935 F.2d at 559:

> Associates and soldiers were required by mob rules to
> obtain their superiors' approval before conducting
> criminal ventures, and had to report their criminal
> activities and profits to these superiors.  Capos
> supervised their crews and shared in the proceeds of
> crew crimes along with the enterprise's top leadership.

Consequently, where, as here, there has been a probable

cause finding that a member or associate of organized crime

committed crimes of violence, courts routinely find that the risk

of continued criminal conduct is substantial and detention is

appropriate.  The rationale for detention in such cases is clear:

> The activities of a criminal organization
> such as [an LCN family] do not cease with the
> arrest of its principals and their release on
> even the most stringent of bail conditions.
> The illegal businesses, in place for many
> years, require constant attention and
> protection, or they will fail.  Under these
> circumstances, this court recognizes a strong
> incentive on the part of its leadership to
> continue business as usual.  When business as
> usual involves threats, beatings, and murder,

> the present danger such people pose in the
> community is self evident.

United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y.
1986), order vacated, 794 F.2d 64 (2d Cir.), order reinstated,
829 F.2d 345 (2d Cir. 1987).

For example, in Ciccone, 312 F.3d at 537-38, the Second
Circuit affirmed the pre-trial detention of Gambino family boss
Peter Gotti, where he was alleged to have "directed the
activities of his codefendants," who committed various exortions,
including extortions of the ILA.  The Second Circuit ordered
Gotti detained irrespective of the fact that he "was not charged
with having committed the extortions alleged in the indictment."
Id.; accord Defede, 7 F. Supp. 2d at 391, 395 (ordering detention
of defendant charged with extortion and extortion conspiracy, and
holding that "[g]iven Defede's position of leadership in a
notorious and violent criminal organization, his ability to plan,
order and supervise criminal activity is of paramount importance.
Defede is a danger at least as much for what he might direct or
assist others in doing as for what he might do himself").

Similarly, in United States v. Colombo, 777 F.2d 96  (2d
Cir. 1985), the captain of an organized crime family crew was
ordered detained because the operation of that organization posed
a "risk to the public" and a "danger to the community" by its
"consistent pattern of orchestrating a series of violent criminal
operations."  The Second Circuit affirmed the result despite a

finding by the lower court that there was "virtually no evidence of Colombo's direct participation in the crimes charged." Id. at 99.  Finally, the Third Circuit in United States v. Provenzano, 605 F.2d 85, 89 (3d Cir. 1979), affirmed the district court's order of detention pending appeal where defendant had convictions for extortion and labor racketeering, raising the potential that defendant "would continue to exercise his influence within the union corruptly and in violation of criminal law."

C.   Obstruction of Justice

Pretrial detention also is warranted in cases in which there exists "a serious risk that such person will obstruct or attempt to obstruct justice."  18 U.S.C. § 3142(f)(2)(B).  Although the underlying rationale for the rule is based to some degree on the need to protect potential witnesses from harm, detention is nonetheless authorized by statute absent the prospect of violence.  See, e.g., United States v. LaFontaine, 210 F.3d 125, 135 (2d Cir. 2000) (affirming lower court's revocation of defendant's bail based on evidence that LaFontaine had sought to influence witnesses while released on bond, and reiterating "that a record of violence or dangerousness [in the sense of violence or threats aimed against witnesses] is not necessary to support pre-trial detention").

Moreover, the statute is not limited to witness tampering, and instead sweeps broadly to protect any perversion of the

justice process.  As the Second Circuit observed in <u>LaFontaine</u>,
"pre-trial detention was even more justified in cases of
violations related to the trial process (such as witness
tampering) than in cases where the defendant's past criminality
was said to support a finding of general dangerousness."  <u>Id.</u> at
134.  In the present case, as alleged in the Indictment, Scarfo
repeatedly engaged in obstruction of justice with respect to his
supervised release conditions.  Such conduct clearly constitutes
obstruction of justice within the reach of the statute.

**D.   Elaborate Bail Packages**

It is well established that even the most elaborate
conditions of home detention cannot substitute for incarceration
where the defendant is violent or cannot be trusted to comply
with the conditions of release.  For example, in <u>United States v.
Bergrin</u>, Cr. No. 09-369, 2009 WL 1560039, at *9 (D.N.J. May 29,
2009), Magistrate Judge Madeline Cox Arleo ordered the defendant
detained where he had advanced his criminal enterprise "through
conversations and meetings" in which he directed others to commit
crimes because "even the most stringent house arrest does not
address this harm and does not minimize the very real possibility
that further similar criminal conduct could be carried out from
home."

Courts have consistently held, particularly with respect to
prohibiting criminal association, that elaborate bail conditions

32

> have an Achilles' heel: if there is a unifying theme in
> this intricate set of restrictions, it is that
> virtually all of them hinge on the defendant's good
> faith compliance.  To illustrate, electronic
> monitoring, while valuable in pretrial release cases
> . . . cannot be expected to prevent a defendant from
> committing crimes or deter him from participating in
> felonious activity within the monitoring radius.
> Second, by allowing outside visits to doctors and
> lawyers, the conditions open up a sizeable loophole;
> there is no feasible way of assuring that [the
> defendant], while en route to and from such
> appointments, will not make stops and take detours with
> a view toward continuing his criminal life.  House
> arrest poses much the same problem; limiting visitors
> can only work, for example, if the appellee submits the
> names of potential guests for clearance. . . which,
> itself, is honor-dependent.

United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir. 1990);

see also United States v. Bellomo, 944 F. Supp. 1160, 1167

(S.D.N.Y. 1996) ("As in *Colombo* and *Orena*, the nature and extent

of the danger that Bellomo presents arises not only from the

threat of violent acts on his part, but from his position of

leadership in a criminal organization and his ability to plan,

order, and supervise criminal activity arising from that position

as well.  He is a danger at least as much for what he might

direct or assist others in doing as for what he might do himself.

Keeping him under house arrest would not defuse this danger.");

United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("home

detention and electronic monitoring at best 'elaborately

replicate a detention facility without the confidence of security

such a facility instills'").

In light of Scarfo's egregious, repeated violations of his supervised release conditions, there is absolutely no basis upon which to conclude that he will engage in the type of "good faith" compliance required for such elaborate bail conditions to be effective.

## ARGUMENT

**A.    Scarfo's Lengthy Criminal Record**

As a threshold matter, Scarfo is a repeat felon with several convictions dating back 20 years.  Specifically, in November 1988, he was arrested and charged with aggravated assault and related offenses.  In June 1990, Scarfo was convicted of simple assault, conspiracy, and reckless endangerment.  He was sentenced to 2 years probation.

In 1993, Scarfo was convicted of state racketeering charges in New Jersey and sentenced to 7 years in prison.  Scarfo was identified as an associate of the enterprise charged in the indictment.  Scarfo was paroled in 1995.  His parole was revoked in 1997 as a result of a 1997 conviction in New Jersey for possession of a weapon for an unlawful purpose.  Scarfo was sentenced to 13 months in prison on that charge and the parole revocation.  He was released in June 1998.

In 2002, Scarfo pleaded guilty in the District of New Jersey to operating an illegal gambling business, and was sentenced to 33 months imprisonment and 3 years supervised release.  He was released from prison in 2005 at which point his supervised release commenced.  This was the period of supervised release Scarfo was serving during the crimes charged in the instant Indictment.

35

Scarfo's past criminal record and persistent recidivism is indicative of an inability or unwillingness to comply with the rule of law.  In either event, Scarfo's release poses a danger to the community and his detention is warranted on this ground alone.  See, e.g., Provenzano, 605 F.2d at 95 ("The trial judge's study of decisions interpreting the Act's 'danger to the community' provision, however, convinces him that courts are not confined in such cases to considering only harms involving an aura of violence.  We agree and hold that a defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute a sufficient risk of danger to come within the contemplation of the Act.").

**B.  Scarfo's Violations of Parole and Supervised Release**

An analysis of Scarfo's criminal history illustrates that he has been undeterred from the commission of additional crimes by previously imposed conditions of release.  There is, therefore, no reason to believe that Scarfo will comply with even the most stringent conditions of release imposed by this Court. As such, there can be no real question that any conditions of pretrial release set by this Court would be flouted by Scarfo, just as he previously did with respect to Judge Joel A. Pisano's supervised release conditions.  See, e.g., Bergrin, 2009 WL 1560039, at *9, *11 ("Plainly, he did not abide by his conditions of release.  The court has no assurance that he will refrain from

36

criminal conduct if released. . . .  The serious nature of the
charges, allegedly committed while defendant was on bail,
militates strongly in favor of detention."); <u>United States v.
Dees</u>, 467 F.3d 847, 852 (3d Cir. 2006); <u>United States v.
Terpening</u>, 902 F.2d 42 (9th Cir. 1990) ("Violation of conditional
release following a parole violation is similar to violation of a
pretrial conditional release: in both instances the defendant was
given his liberty on the understanding that he act lawfully, and
in both cases the defendant violated this trust.  Such a
violation is indicative of recidivist tendencies.  Moreover, like
violation of pretrial conditional release, violation of
conditional release following a parole violation is not otherwise
reflected in a defendant's criminal history.  Thus, Terpening's
violation of conditional release . . . is an indication that his
criminal history significantly under-represents the likelihood
that he will commit further crimes . . . .").

C.   **Nature of the Instant Charges**

The present charges against Scarfo involve crimes of
violence and evince increasing criminality.  Notably, the instant
charges demonstrate Scarfo's continued criminal involvement with
the Lucchese crime family.  His leadership in the extortionate
takeover of FPFG and the related scheme to defraud involved the
threatened use of force, violence and fear.  The instant charges
establish that Scarfo has been undeterred from continued criminal

involvement with organized crime.  As a result, the instant
charges are even more serious when considered in conjunction with
Scarfo's past conduct.  <u>See, e.g.</u>, <u>Provenzano</u>, 605 F.2d at 89
("Concluding that he would continue to exercise his influence
within the union corruptly and in violation of the criminal law,
the trial judge found that Provenzano's freedom pending appeal
would constitute a danger to the community.").  Consequently, the
nature of the charges at issue here weighs heavily in favor of
Scarfo's detention.

**D.    Weight of the Evidence**

The weight of the evidence against Scarfo is overwhelming,
and includes countless recordings, cooperating witnesses,
physical surveillance, and extensive documentary and electronic
evidence seized from Scarfo's house and those of various criminal
associates.  The government will establish Scarfo's decades-long
involvement with the Philadelphia and Lucchese crime families
through cooperating witnesses, law enforcement agents, and
electronic and physical surveillance.

In short, the evidence in this case establishes that Scarfo
committed the crimes at issue, and that he did so by virtue of
his membership in the Lucchese crime family.  As set forth above,
courts routinely consider the heightened danger posed by a
defendant's membership in an organized, criminal enterprise when
evaluating whether pretrial release is appropriate.  Here, no

condition of release could ensure that Scarfo would renounce his status in the Lucchese crime family and the requirement that he engage in criminal activity in order to make money for the Lucchese crime family.  Scarfo's position within the Lucchese crime family and the likelihood that he will continue to direct the activities of criminal associates is, therefore, a danger to the community that cannot be mitigated barring Scarfo's detention.  See, e.g., Salerno, 631 F. Supp. at 1375.

**E.   Severity of Penalties Faced**

Scarfo, age 46, faces severe penalties, including a maximum prison sentence of 455 years, if convicted of the instant charges.  Under the United States Sentencing Commission's guidelines, Scarfo likely faces an advisory guideline range of 360 months to life in prison.  Thus, there is a distinct possibility that Scarfo will spend the remainder of his days incarcerated.  Accordingly, despite any ties to New Jersey or other available bail conditions, Scarfo poses a serious risk of flight.  See, e.g., Bergrin, 2009 WL 1560039, at *8 (balancing defendant's "significant and long-standing ties to the community" against defendant's criminal history and ordering detention); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Consideration of the nature of the offenses charged involves consideration of the penalties.  The defendants are charged with multiple counts, and it is reasonable, from their perspective, to

39

look at the potential maximum sentences they face if they were
found guilty on each count and sentenced consecutively on each
count.  Whyte faces a potential sentence of 35 years, Mohan and
Townsend a potential sentence of 70 years.  . . .  Facing the
much graver penalties possible under the present indictment, the
defendants have an even greater incentive to consider flight.").

*   *   *

For all of the foregoing reasons, the government
respectfully submits that the Court should enter a permanent
order of detention as to defendant Nicodemo S. Scarfo based on
danger to the community and risk of flight.  The government
respectfully reserves its right to supplement its position.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

By: _____
    Steven D'Aguanno
    Assistant U.S. Attorney

_____
Lisa C. Page
Trial Attorney
United States Department of Justice
Organized Crime and Gang Section

40